The Honorable Justice of the United States Court of Appeals in and for the 17th District of Georgia in series, series, series. All persons having business before the Honorable Court are not to be drawn near to give their attention if the Court is not sitting. That is the United States and the Honorable Court. We're here on Mr. Bahena's behalf this morning, and I'd like to start by addressing the first issue we raised, which deals, of course, with the expert opinion testimony of Special Agent Samaniego. And that's, of course, barring any other suggestions from the panel. But we have submitted on Mr. Bahena's behalf that this testimony constituted error, and yes, plain error. Between the filing of our brief and the government's brief, there was an important opinion that came down. That was the Ghan case, which addressed essentially the same issue in some detail. I most certainly want to spend a good deal of my time this morning talking about that case in greater depth. I do want to start first, though, and talk a little bit more about what exactly our claim of error is, because I think the government, in its response, it focused its firepower, so to speak, on the sub-issue of the expert's interpretation of obvious words and phrases. And that's problematic. Appellate courts around the country have recognized it's problematic, but that's not necessarily the heart or the crux of our argument, if you will. What and what that is, what that is is it's really the biggest issue we have with this testimony is the wholesale interpretation and narration, etc., etc., of the wire recordings. Can you be more specific, please? You've made in your brief some very general statements about the interpretation of transcripts and how improper it was, and some very broad claims without really specifying or pinpointing the specific transcript, the specific testimony. Can you provide any more specificity, please? Yes, Your Honor. And it absolutely is a broad claim. I don't disagree in a sense, but how do we bring a broad claim into a narrow institution? I'm sorry. I don't mean to interrupt you, but I know in the interest of time. So if we're reviewing for plain error, and my concern with your argument is in reviewing for plain error, we need to know exactly what portions we're reviewing. And your broad statements that the agent's testimony was improper and he went beyond just interpreting code words, it would be much easier to review that claim if you could identify in the transcripts or narrow it in some way so we know exactly what to look at. Absolutely. And I would refer, Your Honor, in our opening brief, we did specify specific transcripts, specific wire recording exhibits. And then the way we chose to do it was bullet point those specific issues going through the transcripts. So just it's a lot. I mean, it's a lot to go through, but it starts with 301T. It was page 560 of the transcript. And just to use that one as an example, the expert testified that Marcos Mejenas is here in this recording asking when something is going to happen. The next bullet point, he refers to the they in quotations as the ones who are going to receive a load of cocaine. He indicated in the same transcript that here what's going on is Jose indicating next week he needed money to pay a debt. And it goes on and on. So I would certainly refer, Your Honor, to those specific transcripts. And at the end of the day, I think it's a little easier to talk about. We pointed those out, and I'm certainly standing on those, and I direct Your Honor to that. But at the same time, talking about the law as for what it is and in this broad sense moving back and forth between the general and the specific is both fruitful, I think. Why wasn't there an objection? Much of this looks like it could have been cured. For example, you say that they asked broad, open-ended questions, which usually that's what we want on direct examination. Why was there no objection? It's not in the record, right? I could only speculate myself as to what it is. Amir Mohamed was Mr. Mejenas' trial counsel. We weren't. I don't know. And, you know, one of the things that came up in Ghan, Mr. Chornis and I were the attorney of record in that case too, so it's becoming a little bit of a pet issue here for us. But, you know, one of the things the government in Ghan, they didn't advance it here, but in Ghan they actually made an argument about whether the waiver or not making an objection was a strategic decision or something along those lines. And that maybe goes to answer your question. There was no argument like that in this brief, and I think for good reason because I guess the way I'd answer is with the rhetorical question of what reason is there to let them do this, right? Well, that's not how it works, though. I mean, if a witness is testifying in a way that you think is objectionable, in terms of appellate review, we certainly don't look at, well, why were they doing this? We're reviewing it here for plain air. It would have been a different standard of review if you had objected, and many of your objections seem like they could have easily been cured with an objection. Many of your objections here look like they could have easily been cured with an objection at the trial. I don't disagree with that. I think they could have, and I think the trial- But don't that take us, if you don't disagree with Judge Zinni, doesn't that take us right now to Ghan and the distinction, how do we distinguish your facts from Ghan? I have a lot to say on that, Judge Pryor. Why don't we start there? Okay, I'll start there. Well, yeah, that's maybe the most important specific question for me to answer this morning, and I very much want to. I think, number one, the testimony itself is more problematic. It's more erroneous, and it really started from the fact that the questions here- Saying that it's more erroneous doesn't negate that there was no objection made. Well, it affects the plain error analysis, right? The fact that the errors have a greater magnitude is absolutely baked into that sort of materiality and prejudice analysis, right? And comparing the transcripts and the actual testimony, one of the ways you can really see it, I think, is when you look at the questions the government's trial attorney posed. And we detailed those in our reply, too. And, I mean, I'm not being hyperbolic when I say it was literally, let's look at the next transcript. What do you think, agent? How about this one? Can you walk the jury through- I mean, they used the phrase, just walk the jury through this transcript, agent, expert, over and over again. And those broad questions led to even broader answers. So that's, number one, is that I think the testimony itself was more problematic, and the error was of a more significant magnitude. Two, I think it had a more significant impact on the trial. Just to- number one is with respect to the charges. That's a really big point here within this argument. And it's that in Ghan, if you recall, there was a- it was a money laundering conspiracy. That's what all the wire recordings intercepted. And that's what that testimony interpreting them was about. There was a break. The conspiracy was alleged to have stopped. And then the courier from it gets grabbed by federal agents like a year or so later and agrees to cooperate and agrees to reinitiate contact with Ghan and establish- and arranges these hard controlled pickups that made later hard counts. That's important because at trial, Ghan was actually- he held the government to its burden of proof and was acquitted of the conspiracy. He was convicted of those later hard counts. And for those, he presented an entrapment defense. So all of the interpretation of the conspiracy evidence was only relevant and only impacted the counts he was actually convicted of and appealing in that indirect way insofar as it bore on the predisposition prong of an entrapment defense. So here, you don't have that. You just have one unitary set of facts, one conspiracy where the wire evidence- But doesn't that go to the prejudice prong? Absolutely. Not the plain error prong? It goes to whether or not the error was plain is the way I would phrase it. It makes the significance of the error- this testimony was more important to this case and the charges that he was actually convicted of. And then on- so we're still- I think I'm talking about both plain error and kind of Ghan, why it's different here. And I also think on that point, Judge Pryor, this case was much- was closer than in Ghan. It was remarkable to me how much insight we actually, first of all, had into the deliberation and what the jury thought about the evidence here because there was quite literally a moment where the court security officer got so concerned about how at each other's throats they were. He came out and told the district court, you know, whatever he said, break it up. You got to calm them down because it was so heated. They came back and they needed a silver instruction because they were deadlocked. And then they ultimately delivered a split verdict, which I know we have that, you know, regardless of the sufficiency and consistency claim, there's a lot of insight into what the jury thought. And I think that certainly something we can look at. But then also when we turn to the specific facts itself, you know, we went through it. There's no- there was- these wire recordings, it was a very circumstantial case. And they can- of course they can be strong on occasions and often are. And, you know, I know the government always says our case is- the evidence is overwhelming, but we know that it's not necessarily the case. And this is one where there was no physical evidence really. There was no fingerprints on the drugs. The drugs were seized, so that's physical evidence. Well, they- there's- I should be more specific. There was physical evidence. There was the wire intercepts and things like- and sort of hard evidence like that. But none that went to what the really contested issue was to get the government over the hump of establishing Marcos Bahena's knowing involvement in a conspiracy. It was all inferential but for this expert testimony who was drawing those conclusions for the jury in a way that should have been made in a closing argument, not through an expert just Monday morning quarterbacking it, so to speak. But we talked about the distinctions. And, you know, there's- in Ghan, this court relied extensively on the fact that that insider did testify in Ghan, that they had that cooperating witness who was a part of the conspiracy come in and tell the jury herself. And the cooperator in this case was located, but there was an objection made that he would not be permitted to testify at trial, correct? There was no such testimony, correct. And there was- I don't think there was- But there's a reason that that testimony wasn't provided in this case. Well, we certainly know the government wanted to introduce it and the defense wanted to keep it out, but there was no specific offer of proof as to what the man would have said. He was allegedly an insider. He was also Marcos Bahena. He was a family- I don't remember exactly. It was something like a brother-in-law or something like that. But there was no- he didn't testify. That's not part of the evidence. They did not have any cooperator inside testimony to explain these wires, which was, I think, particularly important to this court in Ghan because it synced up with what the expert said, right? They could look at the bucket of what the expert's saying and compare it to what this insider's saying, and you didn't have that here. There was no confession, admission, things like that, right? But moving on, the last major point I would say about a distinction with why should Marcos Bahena's get a remand when the defendant in Ghan didn't is there was also a sua sponte instruction given by the district court in Ghan. The district court, on his own, interrupted the examination and said- to paraphrase, he gave the patterned instruction regarding- you can weigh an expert's testimony the same as any other as you're free to accept or reject any part of it, right? That was given, in this case, at the end. Correct. Not in the middle of the examination, though. Does that matter under our case law? Well, it did to this court in Ghan, I think, at least my reading of the opinion is that it did. The court specifically cited it and pointed out, and I'm not saying the district court should have or had to or anything like that. Of course, that's not the case. But it did happen in Ghan, and that did mitigate any ostensible error, so said the court in my reading. Why wouldn't it, under that same reasoning, why wouldn't it mitigate any potential error if it was given with the other jury instructions? Well, obviously, getting a contemporaneous instruction has some importance. We all recognize that it's important. And there are certain situations where parties are free to ask for limiting instructions to be read at the time of receiving evidence, especially with everything else that's going on in this case where the evidence was only a day and a half long. And that does bring me back to one other point I wanted to say about- Well, it cuts against you in a way, then, in terms of the timing of the instructions. It may not have been contemporaneous, but it wasn't that much afterwards, and there was only one expert. Yeah, no, that's fair. Well, there was an extra expert. I don't recall if it was through stipulation. I think the Forensic Witness Act, there was another expert who did testify. I thought that ended up through stipulation. Once the witness started, there was the concern. But I do recall there was some discussion. I think it was Sarah Manny was her name that, in the closing argument, it was referenced telling you about it and discussing that sort of forensic testing that occurred. I do want to bring into this, too, when we're talking about plain error and the closeness of the case and everything, too, is there are some facts that are kind of- I don't want to say shocking, but with respect to the 404B evidence and the other issues and the sort of things that are going on in this case, and when we're talking about what the jury is seeing and hearing- Could we spend some time talking about the receipt of the inadmissible testimony? Of the 404B evidence? Yeah. Would that be cumulative error test? I think so. I mean, obviously, there's this huge waiver problem. I'm not hiding from that. It's tough to me to talk about this, in a sense, because it was a situation where the trial counsel for Mr. Bahena, the way he lodged the objection to it initially was Mr. Bahena- He specifically said, my client wants me to ask you for a mistrial, Judge. The trial court said, wait a second, I want to hear from the jury before I rule. The first one came out, and then trial counsel said again, Mr. Bahena wants me to maintain my objection. And then it was only after the second one where there was a brief recess that he said the client affirmatively has considered it and wants to withdraw the motion. Why isn't that an intentional relinquishment, a strategic decision? I'm not jumping up and down about that point, but as Judge Pryor pointed out, there is case law we cited, the Ninth Circuit case in particular. I haven't located one in this court, but it's certainly something that we would ask this court to consider with respect to a cumulative error claim, which- But in the Seventh Circuit, if you intentionally relinquish your right, it's waived. And here, I don't know how you get around the intentional relinquishment because, quite frankly, rightly so, he withdrew his objection because he didn't want a mistrial because he knew if he had been tried again, they would be able to call Juanito, the individual who he had been engaged in conversations with about the drugs. Right. And I will say, we don't know what- there's no offer of proof. We don't exactly know what Juanito would have said. That's true, but I think based on the lawyer's comment when he withdrew the objection that he had discussed with his client the potential implications, including the fact that other witnesses who couldn't testify in this case might be called, I think we can draw a very fair inference from that. Of course. And that's kind of why. That's the case, too, as you described the law regarding waivers. It's no different in the Ninth Circuit, which is the only case I was able to locate that discusses cumulative error. And it's still, yes, there's this big waiver concern with respect to direct substantive consideration. But on a cumulative error claim, which is really constitutional in nature, I think it's slightly different. And there's certainly support for finding it. And when we just look at the fundamental fairness and the equities at play here with the jury receiving evidence of a client that was barred using cocaine months before, and in the last issue, too, the last substantive issue about them learning he was in jail in the middle of the examination to stipulate to it. There's a lot of problems here. There were definitely a lot of issues for a very short trial. You're into your rebuttal time if you want to say that. I know. I appreciate it. Thank you. Screamer. Good morning. Good morning. May it please the court. The district court did not plainly err by failing to sui sponte strike questions asked to the expert or answers given to which counsel offered absolutely no objection. And first, there was no clear or obvious error. The objection is basically to the form of the question that it called for in the experts answer provided narration. In the first instance, whether a question. God, we sidestepped the question. Yes. As to whether or not allowing agent to give, in essence, block quotes, block summary, whether or not that permissible was, in your opinion, do parts of agents Amigo's testimony clearly admissible. If there had been an objection, it's almost as hypothetical. What I was in answer to that, your honor, there are definitely as the court acknowledged and gone by asking questions this way. You do end up with the possibility and certainly did in this case where there may be certain words that weren't codes or ambiguous that you get included in it. The question, though, according to God and what they observed in God is what the substance of what was testified to be any different. If the questions had been as easily could have been more narrowed. And so in answer to your question, I would say two things. First of all, in certain instances and whether you're calling for narration depends on context. As Judge St. Eve was getting at. Because if you have a provision or a section of a conversation, which we did in this case, that are basically replete, you know, filled with codes and ambiguity. Then asking what does this part of the conversation or what is this conversation mean is doesn't necessarily call for narrative. And certainly wouldn't be an obvious calling for it or clearly erroneous to call for it. And so that's number one is to a number of these conversations. But even where, you know, there would be uncoded or non-ambiguous language included. The question, as I say in God is, was there any substantive difference? And what this court acknowledged in God was that in that case, there really wasn't. And what I would point out, too, is that the cases that the defendant sites Hawkins out of the 11th, Greenwich out of the second. That, you know, where the court does find plain or error in these kind of things are cases where the agent who testified was the case agent. And in Hawkins, for example, that agent testified both as a case agent and as an expert. But was that part of the court's reasoning there? I agree that is a distinction. Yes, Your Honor, because what happened in those cases, even on the error point, is that these agents relied on lots of evidence that was never presented to the jury. So in interpreting these conversations and going into narrative, their narrative included stuff that the agent knew that wasn't in front of the jury. That didn't happen here. In other words, the substance was different because they weren't just interpreting what was on the page. They were bringing in things they knew. You know, I think in one example, in one of the cases, he testified that in this conversation, he was getting a good deal. And he knew he was getting a good deal because from the investigation, he knew what they were charging in other circumstances. That didn't happen here. This agent, as the jury was told, and as the record is clear, this expert only knew what was in the transcripts, the words on the transcript. He had no involvement in the case. And what's more, as the defense counsel asked very few questions in cross, but one of them was, did you even listen to these tapes, which were in Spanish? And he said no. He had before him his expertise and everything that the jury had. And so I would say that in overall, in answer to your question, Judge Pryor, the issue is, is there anything substantively different that would have come out to have alerted the judge, wow, this is really plainly, obviously erroneous narration that's, you know, coming from this. Ms. Greenwald. Yes, Your Honor. Didn't the testimony that was elicited basically lay out the theory of the government's case? Well, I would say, Your Honor, to the extent it did, it's because the transcripts laid out the theory of the government's case. Because to the extent the agent was testifying to things that weren't ambiguous or coded, they were obvious. They were obvious from the transcript. You know, to say that. You saying that just shows the improperness of the testimony. Absolutely. But I would say that, no, no, no.  Your Honor, I'm not saying that everything that was said here was necessarily only of non-ambiguous coded language. I don't think you could say that. Yeah, there were instances where it wasn't. I mean, absolutely, and I take defense counsel's point as to that. But the question is, was it substantively? You know, was there anything that would have either alerted the court or this court that it's obviously erroneous? And I would submit, no, because to the extent in a lot of these conversations or parts of them where this happened, it was, you know, to the. I guess one, you know, to say that because the agent says ads, not just that, you know, 30 in this conversation means 30,000 means talking about drug prices. But ads, they are discussing drug prices. Do you know what I mean? Things like that that are obvious, right, doesn't then take it into the form of improper narrative that a court would be alerted to. That's what I'm saying, that when you look at that. And I guess that also takes us into the question of prejudice, because I guess what I'm ultimately saying, too, is that there's no prejudice here. And so that even if it did border into it improperly, it didn't prejudice the defendant. And certainly he can't carry his burden to show that it substantially affected his rights. Because, first of all, there are similarities to Gunn, where, first of all, there was the expert didn't participate in the conversation. I mean, in the, sorry, in the investigation of the case. He just testified as an expert. But also the jury was carefully instructed that they could disregard his testimony, judge it like any others. And I would add he was the last witness of the government's case. The defense put on no witnesses. The instructions happened before argument. So it was pretty close to his testimony, this witness's testimony, that the judge instructed the jury about this. But you would agree that it likely has a greater impact if you give a contemporaneous instruction, rather than at the end. Potentially. I'm not saying it's required, but to do it at the moment. Potentially, but I think it really depends on the context of the case, where it sits close here, and where it wasn't asked for. I mean, that's the other thing, too. It was not asked for. I think the point, though, it wasn't asked for in Gunn, either. No, but I think, no, it wasn't. And I wonder if that wasn't the case, because in Gunn, it was even more obvious that was going on to the court than what is the case here. Because I don't think, I think when you read the testimony, it's just not obvious here that that's what's going on. So, you know, I think that goes to the clear error, too. But I would also add that here, in the defense counsel's argument, I don't know if this happened in Gunn, it's not noted. But here, the defense counsel actually pointed out, you don't have to believe this expert. And here, the government, you know, contrary to the defendant's argument. What other evidence did the jury have to interpret Mr. Mahaney's conversation? Whose conversation? Mr. Mahaney's conversation. Mahaney's conversation? Yeah, because the prejudice seems to be spelled out here. Well, two things. First of all, I would point out that 27 transcripts were introduced in this case. The expert testified only about eight of them. And as to only four of them, was the defendant himself a participant. As to the other four that he testified to, it was his brother talking to other drug dealers, Chio and Fio, Chufo and Fio. And defense counsel's defense acknowledged, didn't refute, that his brother was involved in drug dealing and bringing in a load of drugs. But that would go directly to the conspiracy count. So I don't know how helpful that is to your argument, that defendant himself was only on four of them. Right. No, absolutely. And as of those four, I would say that as to those four, the only part that you could take away the agent's entire testimony. And the evidence is overwhelming. And that's because that evidence was based on his incriminating statements coupled with the surveillance evidence. And the defendant said in that tape, the damning tape, in my opinion, that just nailed him in this case, was, I told Juanito that there were two animals coming. Now, yes, the agent testified animals meant cocaine or meant drugs. That's not disputed that that was code and that that would be entirely proper testimony. The government said, you don't even need that. In our arguments, we said, you don't even need the expert in that. Because you know that animals was drugs because his brother's talking about the delivery of animals, using that same code word the day before in conversations with Fio and Chufo, using the same word animals. The next day, the defendant uses it with him. And what shows up, what shows up from the delivery of this truck and the delivery, what shows up and gets seized from the car, but almost a kilogram of cocaine. So it was clear that that's what he was talking about. And moreover, the defendant says, and when he uses this word animals, he says, I told Juanito this because, quote, if we tell him nothing's coming, well, it'll be there. What if he gets upset? It'll be there. In other words, the defendant himself, and the expert didn't testify to what I'm about to say. It'll be there. In other words, whoever's there to receive this is going to see what shows up. Juanito's going to see. Jose, his brother's going to see. But the evidence shows conclusively the third person who was there, and this is independent of the expert, was the defendant. He was going to see, too. And he knew he was going to see. So, you know, we may say our evidence is overwhelming all the time. It's overwhelming here because it came out of his mouth, independent of the expert. So while this case certainly has different facts than Ghan in terms of showing that this wasn't prejudicial to him, it still shows it. Every case, of course, goes to its own facts. We have enough similarities with Ghan and enough differences. Mr. Levitt makes the argument there are so many jury deliberations were contentious to the point that the bailiff comes in and says, District Court, we need to get you involved. Does that suggest that kind of even the smallest error would have been enough to kind of tip the balance? I'm not aware of any case law that would support that, Your Honor. I'm truly not because I think a jury reaches a verdict, right, and we don't second guess that verdict and we don't analyze that verdict. So I haven't read and I can't think of a good policy that would support us getting in or any court getting into an analysis of jury deliberations. And I would add on the jury binder issue, a waived issue under Grost, G-R-O-C-E, I might be saying that incorrectly, cannot contribute to cumulative error. That was waived for strategic reasons. I won't go through that again because I think the court totally understands them. But that was a quintessential waiver, and it cannot be used under this court's precedent to calculate, you know, cumulative error. How did that happen, by the way? How did that transcript that the court specifically sustained the objection to its admission get sent back to the jury? I don't know. I know it was only in two jurors binders, but one is too many. I mean, this was going on during COVID, but I don't know. But it's not an excuse. It's absolutely not an excuse. And I do not know, Your Honor. I do not know. The government, I can say from the record, truly believed it wasn't there because we represented to the court several times that they had been removed. The court implored defense counsel to check everything going back. So they missed it as well. So I truly do not know. It clearly was erroneous. We're not trying to defend that that happened. Mistakes happened. But we would say the court handled it expertly, excellently, questioned the jurors. And the sincerity, I would also add in the defendant's analysis in terms of his waiver, it wasn't just that the likelihood that this other witness, Juanito, could be called. It was weighed against the fact that these jurors were so sincere, particularly the only one that had looked at part of the transcript. She was almost in tears, it comes through the record. And the judge was consoling her, saying, you did nothing wrong. And she assured the court to the persuasion of not just the court, but the defense counsel, that she was not going to be sharing this with anyone, and she would not let it be considered in her deliberations. So I think this, while it's an unfortunate thing that it happened, and it did not harm the defendant in any way, shape, or form, even aside from the waiver. I think that comes absolutely through the transcript. And the only other thing I want to add before, unless the court has any other questions, I just wanted to remind the court of what this court said in Gan, going back to the whole issue of the expert testimony. There, the court said, it noted, as this court has in questioning, how easy it would have been to correct these questions to the extent they were objectionable. And this court reminded, had he objected at trial, the questions could have been narrowed easily. And this court stated, it really makes sense to find plain error and order a new trial based on aspects of expert testimony that could have been so easily corrected had objections to the extent they had merit the most at trial. And I would say this case is not that rare case. It's not a case like Hawkins or Greenidge that warrants this court finding reversible plain error based on the record before it in this case. So unless the court has any other questions, I would, the government requests that you affirm the conviction and sentence. Mr. Levin? I do, just to pick up where your honors and the government left off, with respect to the ease of making an objection, I don't know any precedent for how that affects the plain error analysis. I don't think it does. And I think all objections, all oral objections like that to improper questions are frankly as easy as any other to raise and correct in the middle of the trial. One other point I wanted to clarify, too, was what actually happened, it was around page 726 of the transcript. What happened during the deliberations, it wasn't just other people talking about it. It was actually a juror that came out and told the security officer, things are heated, can you come in here? And then that's what happened in that instance. To step back, though, one of the biggest points I want to respond to with respect to the prejudice and the importance of this expert is kind of some of the questions you were asking about what the actual defense was here. Where it's, again, it was his knowing involvement, whether or not that he was knowing, there's no doubt there was a drug deal, there's no doubt, it's right there in the recording. He arranged for a parking lot for his brother to use, but for what purpose, right? And that's the leap that only this expert got you over. And that's why it's so problematic, too, is when the defense is more or less, yeah, I might have done things along the line of the mere presence activity association. Those principles, that's it, I might have done things that advanced the crime, but I didn't know that's what was going on, I wasn't a participant. And then an expert agent who's been doing this for 20 years or whatever can come in without any knowledge and just say, yeah, and point left and right. Here's what's going on here, here's what's going on here, here's what's going on here, and make those inferences that the government should be making in closing argument. That's a big deal, that's really a big deal. And in this instance, when you, the point about substantial rights, I will say, I think this does absolutely go to the process and the way the trial itself is structured in terms of the presentation of evidence and how parties get to make arguments and when. And not having an extra, one side get extra bites at the apple. I mean, I'd love to call an expert like this in every one of my cases, but there's a reason we can't, right? The other point I just, last point was you heard the government talk about how they made a comment trying to, almost diminishing their own expert in closing about how you didn't need them to tell you what animals was, it was common sense. They made the same point in God, they made the same point in God, and that's also a double-edged sword, right? Because if it's common sense, then it's not helpful to the jury and it shouldn't be happening. In any event, for all the reasons barring any other questions, I'd ask your honors to remain. Thank you. Thank you, Mr. Levitt. Thanks to both counsel, the case will be taken under advisement.